CHRISTHART S. & JUNE SCHILBACH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schilbach v. Commissioner
Docket No. 2708-90
United States Tax Court
T.C. Memo 1991-556; 1991 Tax Ct. Memo LEXIS 604; 62 T.C.M. (CCH) 1201; T.C.M. (RIA) 91556; November 6, 1991, Filed *604 Decision will be entered under Rule 155. Richard A. Uffelman, for the petitioners. Karen E. Stratton, for the respondent. FAY, Judge. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION For petitioners' 1987 tax year, respondent determined a deficieny in income tax of $ 87,736.00 and additions to tax pursuant to sections 6661, 6653(a)(1)(A) and (B) of $ 21,934.00, $ 4,386.80, and an amount to be determined, respectively. After concessions, the sole issue for decision concerns the valuation of goodwill. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Dr. Christhart S. Schilbach (hereafter Dr. Schilbach) [1] and June R. Schilbach (hereafter Mrs. Schilbach), husband and wife, resided in Arizona at the time they filed their petition in this case. *605 In 1977, Dr. Schilbach formed Christhart S. Schilbach, M.D., P.C., an Oregon professional corporation (hereafter corporation) and began conducting a family medical practice in Gresham, Oregon. [2] At the time of incorporation and throughout the corporation's existence, Dr. Schilbach was the corporation's sole shareholder and the only physician employed by the corporation. Mrs. Schilbach became a full-time employee of the corporation in September 1983, taking over the administrative functions of the corporation. The corporation had a large patient base of approximately 3,500 families or 8,000 to 10,000 patients. The corporation's large patient base was the result of the corporation's (i) making medical services available to the patients based on the patient's schedule; (ii) *606 requiring its employees [3] to show an interest in the patients and their families; (iii) providing x ray service, laboratory work, therapeutic massage, ultrasound, and physical therapy at the office rather than referring this work to others; (iv) accepting Medicare payment assignments; (v) billing the patient's insurance company rather than requiring the patient to submit the billing; and (vi) arranging payment plans for those patients unable to pay rather than referring the account to a collection agency. Both Dr. Schilbach and Mrs. Schilbach worked long hours for the corporation, and by 1986 they had become physically and mentally exhausted. Also, in 1986, Dr. Schilbach suffered a detached retina which resulted in lost sight in his right eye, and he underwent neck surgery to repair a ruptured disc in his spine. In addition, in that same year, the malpractice insurance coverage of the corporation and of Dr. Schilbach was terminated *607 due to the settlement of a malpractice claim against Dr. Schilbach. Dr. Schilbach's malpractice insurance had been sponsored by the Oregon Medical Association under a contract with the insurance carrier. Dr. Schilbach went to the Oregon Medical Association and requested assistance in obtaining reinstatement of the malpractice insurance. In doing so, Dr. Schilbach represented to the Oregon Medical Association that he would cease practicing family medicine and enter a new field of practice and obtain adequate training. Although the Oregon Medical Association recommended Dr. Schilbach for reinstatement, the insurance carrier declined to reinsure Dr. Schilbach. For these reasons, and because Dr. Schilbach was interested in psychiatry, he decided to sell his practice and to apply to various residency programs in psychiatry. In July 1986, the corporation contacted the Portland Adventist Medical Center [4] (hereafter PAMC) to inform PAMC of its desire to sell its medical practice. Negotiations for the purchase of the corporation's medical practice continued for several months. By December 1986, two drafts of the proposed purchase agreement and a proposed employment agreement involving *608 Dr. Schilbach [5] had been circulated between the corporation and PAMC. With regard to the proposed purchase agreement, the first and second drafts provided that the purchase of the medical practice would be effective December 29, 1986. Also, the second draft provided that PAMC would pay, for the corporation's goodwill and intangibles, an amount equal to 30 percent multiplied by the corporation's gross yearly [6] billings. Neither draft contained any reference to a covenant not to compete. Some time in December 1986, it became apparent that the December 29, 1986, *609 deadline would not be met. Petitioners' tax attorney advised petitioners that, due to favorable liquidation and capital gains provisions available in 1986 and not in 1987, the net amount received after taxes from the sale would be substantially greater if the corporation liquidated by December 31, 1986. Accordingly, on December 29, 1986, the corporation was liquidated, and all assets were distributed to Dr. Schilbach in exchange for his stock. For purposes of reporting gain and calculating tax due on their 1986 Federal income tax return, petitioners valued the corporation's goodwill and intangibles at $ 120,000. Petitioners arrived at this amount for the goodwill and intangibles by utilizing the same formula as provided in the drafts of the proposed purchase agreements, including the fourth draft, which was ultimately signed by Dr. Schilbach and PAMC. A few days after the liquidation, a third draft of the proposed purchase agreement was circulated between Dr. Schilbach and PAMC. The fourth and final draft was signed on January 6, 1987. During the negotiations between January 1, 1987 and January 5, 1987, the attorney for PAMC, for the first time, requested that a covenant not *610 to compete be included in the purchase agreement. Neither Dr. Schilbach nor his attorney objected to the covenant not to compete since Dr. Schilbach intended to leave the State and had no intention of competing with PAMC. [7]
After the fourth draft of the purchase agreement was signed and the medical practice was sold on January 6, 1987, Dr. Schilbach continued the medical practice as an accommodation to PAMC until PAMC could find a replacement physician. In March 1987, Dr. Schilbach was accepted at the University of Arizona to enter its residency program beginning June 1987. After locating a replacement physician, PAMC, as it was entitled to do under the purchase agreement executed January 6, 1987, elected to close the sale and end the transitional period on May 30, 1987. During the first week following the closing, Dr. Schilbach introduced the patients to the replacement physician hired by PAMC. During *611 the second week, the replacement physician did not use Dr. Schilbach's services even though Dr. Schilbach was in the office. after the second week, Dr. Schilbach left the medical practice to begin a residency in psychiatry at the University of Arizona, and, with only one exception, he had no further contact with any of the patients. At the time of trial, Dr. Schilbach resided in Seattle, Washington, where he was completing his residency at the University of Washington. OPINION A professional practice can generate two types of goodwill. Professional goodwill, also referred to as personal goodwill, is attributable to the individual skill, knowledge, and reputation of the professional. Practice goodwill, also referred to as business goodwill, represents the intangible assets inherent in the practice itself, including, among other things, patient lists and records, trained employees, and leases in place. The issue for decision is whether the corporation's practice goodwill, which was transferred to Dr. Schilbach in the liquidation, had any value as of the date of the liquidation given Dr. Schilbach's intent not to use his professional goodwill in competition with a purchaser of *612 the medical practice. Petitioners have the burden of proof. Rule 142(a); . Petitioners argue that the corporation transferred practice goodwill valued at $ 120,000 to Dr. Schilbach. [8] In contrast, respondent argues that, since the corporation did not possess either a covenant not to compete signed by Dr. Schilbach or an employment agreement with Dr. Schilbach as of the date of liquidation, a potential buyer would not have paid anything for the practice goodwill of the corporation due to the fact that Dr. Schilbach could have exercised his professional goodwill in competition with that potential buyer. [9] Therefore, respondent concludes that the practice goodwill had no value on the date of liquidation. For reasons stated below and upon review of the entire record, we find petitioners have carried their burden of proving that the value of the practice goodwill transferred to Dr. Schilbach in the liquidation was $ 120,000. [10]
*613 Throughout the negotiation process, which extended over a period of more than five months, Dr. Schilbach had advised PAMC at all times that he was giving up family practice and that he intended to leave the State. As early as November 1986, the corporation and PAMC drafted a formula to determine the price to be paid for the corporation's goodwill and intangibles. On January 4, 1987, just two days prior to the signing of the final agreement, PAMC requested from Dr. Schilbach a covenant not to compete. Although the final agreement did incorporate a 1-year covenant not to compete from Dr. Schilbach, the final agreement also incorporated the same formula to determine the price to be paid for the corporation's goodwill and intangibles. Since the same formula was incorporated in the early drafts of the purchase agreement and was ultimately agreed upon in the final purchase agreement, we find that the covenant not to compete did not materially change the terms of the purchase agreement. We also find that, during the negotiation process, PAMC, through its employees, felt comfortable with the fact that Dr. Schilbach would give up family practice and leave the State. Moreover, considering *614 Dr. Schilbach's inability to obtain malpractice insurance and his physical and mental condition, we find it was doubtful that Dr. Schilbach would have set up a new practice in direct competition with PAMC. Given this scenario, the fact that on the date of the liquidation the corporation could not assure a potential buyer that Dr. Schilbach would not compete for a year does not change our decision. A potential buyer would take into account all facts and circumstances. See (dentist sold practice, including goodwill, despite the absence of a covenant not to compete but with a professional understanding that the selling dentist would not compete). Further, it is quite clear from the record that Dr. Schilbach did not consider the covenant not to compete significant. When asked by PAMC, Dr. Schilbach agreed to sign the covenant not to compete without any additional bargaining or negotiating. He requested no additional financial inducement. Thus, PAMC secured the 1-year covenant not to compete without any additional cost. Accordingly, we find petitioners have carried their burden of proving that a willing buyer, given *615 the knowledge of all the facts, would have paid $ 120,000 for the corporation's practice goodwill as of the date of the liquidation. Decision will be entered under Rule 155. Footnotes
1. In 1968, Dr. Schilbach received his medical degree from Washington University Medical School in St. Louis, Missouri. Dr. Schilbach then completed a 1-year internship in pathology at the University of Washington Medical Center in Seattle, Washington, and in 1972 completed his residency in pathology at the University of Oregon Health Sciences Center in Portland, Oregon. Dr. Schilbach did not do a rotating internship and, therefore, he had no post-graduate experience in other fields of medicine such as pediatrics, gynecology, surgery, or family practice. Dr. Schilbach did not obtain board certification in the practice of family medicine or in the practice of pathology. From 1972 to 1977 Dr. Schilbach was an employee of Emergency Room Physicians, P.C., which contracted with Gresham Community Hospital to staff and operate the hospital emergency room.↩
2. From February 22, 1977, through October 15, 1982, the corporation conducted the medical practice at 495 N.E. Beech, Gresham, Oregon. On October 15, 1982, the corporation moved its practice to Room 101, 1217 N.E. Burnside, Gresham, Oregon.↩
3. As of the date of liquidation, the corporation employed several nonphysician employees.↩
4. PAMC is a tax-exempt organization pursuant to section 501(c)(3). ↩
5. Petitioners and respondent stipulated that the proposed employment agreement was never executed as it was deemed unnecessary some time in December 1986.↩
6. The year was defined as April 1, 1986, through March 31, 1987.↩
7. The purchase agreement did not contain any allocation of the purchase price to the covenant not to compete.↩
8. Ultimately PAMC paid $ 117,000 to Dr. Schilbach for the goodwill and intangibles.↩
9. In support of his position, respondent cites ; ; . These cases, however, are distinguishable in that the goodwill was solely attributable to, or completely dependent upon, the personal ability of the shareholder(s) or partners. By contrast, the evidence in this case establishes that some of the goodwill of the medical practice was inherent in the operating entity and was not dependent on Dr. Schilbach's ability. First, petitioners and respondent stipulated that the corporation's large patient base was a result of the corporation's extended hours, range of services, billing practices, and general operating procedures. Moreover, respondent concedes that the corporation possessed practice↩ goodwill and that practice goodwill was transferred to Dr. Schilbach in the liquidation. Finally, PAMC actually continued to operate the medical practice after Dr. Schilbach left the state. 10. We note respondent did not argue that the corporation↩, in effect, sold the medical practice to PAMC in 1987. We render no opinion regarding that issue.