IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 13, 2024 Session

## SKIDMORE CAMM GARRETT v. JONA MCKEEHAN GARRETT

**Appeal from the Chancery Court for McMinn County**
**No. 2019-CV-310   J. Michael Sharp, Judge**

_____

**No. E2023-00615-COA-R3-CV**

_____

A husband and wife disputed the value of the husband's business for purposes of equitably dividing the marital estate in their divorce. The trial court adopted a value proposed by the wife's expert. Because we conclude that the evidence does not preponderate against the trial court's findings, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Adam M. Priest, Knoxville, Tennessee, for the appellant, Skidmore Camm Garrett.

Randy Sellers, Cleveland, Tennessee, for the appellee, Jona McKeehan Garrett.

## OPINION

### I.

After more than twenty years of marriage, Skidmore Camm Garrett ("Husband") filed for divorce from Jona McKeehan Garrett ("Wife"). She responded with a counter-complaint for divorce. Because their children were adults by the time of trial, issues mainly centered around alimony and the division of marital property. Wife, who worked as a realtor, and Husband, who worked as a financial advisor, had accumulated a substantial marital estate.

Husband provided financial services through a business called CLG Wealth Management, LLC, of which he was the sole owner. Initially, Husband and Wife retained

an agreed-upon expert to evaluate CLG "to aid the court in making an equitable division of marital property." Months later, Wife learned that Husband had retained a different expert to perform an independent business evaluation. Husband's expert and the agreed-upon expert "used different methods to evaluate the parties' business, and the values therein differ[ed] radically." So Wife also hired her own independent expert to value the business.

At trial, each of the independent experts and Husband testified about CLG's value. Husband explained that the business consisted of him and one other employee, who worked in an administrative role. Husband was the only one who "provide[d] investment management, retirement, estate, and financial planning." Although the business partnered with Raymond James Financial Services, Inc. to use its platform to purchase securities and make transactions, Husband was "an independent contractor and not . . . an employee" of Raymond James. Husband's clients belonged to him.

CLG's business was built primarily on Husband's relationships with his clients. According to Husband, most clients had either followed him to CLG from his previous employment, come to him by referral from existing clients, or met him through social connections. Very few clients were "walk-ins" who had found CLG even though Husband had not marketed to them.

Husband explained that he received compensation for his services to these clients "in three basic forms." A small percentage came from "direct commissions" from product sales. Approximately 15% derived from "servicing trails," which were ongoing commissions resulting from products Husband had sold and continued to manage. But most compensation came from quarterly "advisory fees." Advisory fees differed from trail income in that they were paid directly by clients for Husband's management of their assets rather than "by the brokerage house or the insurance company that the product was placed with." Under the advisory fee model, Husband would earn more income "if [a client's] assets under management [went] up" without being "obligated to a particular kind of product."

Husband testified that he had "no idea" how to calculate CLG's value because there were "so many factors involved." One significant factor was Husband's professional goodwill, which was not a marital asset and could not be considered in the equitable division of the marital estate. *See Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985). Husband explained that, hypothetically, someone could buy his servicing trails, but the buyer would not be guaranteed to keep the trail income unless the buyer could "get the client to transfer [to them] and then . . . get the client to stay." Husband did not "know of any practice like [his] that sold." He had previously listed the business on a financial statement as an asset with a value of $0.

Husband's expert witness testified that he valued the business at $57,000. In his view, CLG was "a personal goodwill business." He saw Husband as "a team of one," and he believed that "nobody [would] buy [CLG] without a covenant not to compete." In his view, the business had "zero enterprise goodwill."[1] So he determined that the proper valuation method was the "net asset value" approach. Under this approach, Husband's expert first calculated the value of the business's assets—"in this particular case, the cash, some value for the furniture and equipment"—and then subtracted the value of its one liability, "a small credit card payable at the end of the period."

Wife's expert countered that the net asset value method was more appropriately used to value "companies that hold significant tangible assets and there are no significant intangible assets," where "there is little or no value added from labor," and in cases where each of the other possible valuation approaches "are rendered unusable." Husband's business did not fit into any of these categories. So Wife's expert gave the net asset value method "no weight" in reaching his valuation conclusion.

Wife's expert maintained that the "income approach" was the appropriate valuation method for CLG. He had valued "several" investment advisory firms before this one, including "several Raymond James-affiliated businesses" involving "sole proprietors, just like this." Based on his experience, Wife's expert believed that Husband's business was salable. And that sale would include "enterprise goodwill." Husband would be selling "the access to the revenue stream . . . the client access." The "income approach" appropriately captured this enterprise goodwill.

Using the income approach, Wife's expert valued the business at $398,000. He explained that he arrived at this valuation by first calculating the "cash flow over and above a normal owner compensation" based on an average of the business's earnings over the past three years. He referred to this as "a dividend" that a hypothetical buyer could "put . . . in [his] pocket" if that buyer decided to "pay someone like [Husband] to run [CLG] under a normal owner compensation." He then put together a risk profile for the business and determined "the return on investment an outside investor would need to invest in this business" based on that risk. And he "t[ook] a lack of marketability discount of 5%." The

---

[1] The distinction between personal or professional goodwill and enterprise or business goodwill is important in several contexts. The United States Tax Court had occasion to describe the two types of goodwill in connection with the sale of a family medical practice:

> A professional practice can generate two types of goodwill. Professional goodwill, also referred to as personal goodwill, is attributable to the individual skill, knowledge, and reputation of the professional. Practice goodwill, also referred to as business goodwill, represents the intangible assets inherent in the practice itself, including, among other things, patient lists and records, trained employees, and leases in place.

*Schilbach v. Comm'r*, 62 T.C.M. (CCH) 1201 (T.C. 1991).

final $398,000 value included the value of CLG's net assets plus enterprise goodwill. Wife's expert explained that if he had included personal goodwill in the calculation, he would have reached a value of $532,000.

The court "f[ound] both experts to have been thorough" but determined that Wife's expert's valuation was "most accurate." It accepted Wife's expert's analysis that Husband's "trail income c[ould] be assigned for value, and therefore constitute[d] a divisible marital asset." The court reviewed two reports submitted by Wife's expert that valued the business as of different dates. And the court concluded that CLG was properly valued at $367,000 based on Wife's expert's calculations in the report it chose to adopt. So it ruled that Wife was entitled to receive one-half of that amount in the division of the marital estate.

## II.

Husband presents one issue on appeal: whether the trial court erred in its valuation of CLG Wealth Management, LLC. The value of marital property is a question of fact. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). Thus, the trial court's decision "will be given great weight on appeal." *Id.* We presume the trial court's valuation is correct unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d).

Courts determine the value of a marital asset "by considering all relevant evidence," and each party bears the burden of production. *Wallace*, 733 S.W.2d at 107. In valuing closely-held businesses, like the one at issue here, relevant evidence "includes valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable." Tenn. Code Ann. § 36-4-121(c)(10) (Supp. 2024). Depending on the business, the valuation may take into consideration "a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence." *Id.* Where "the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence." *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). As we have explained regarding closely-held corporations, determining the value of a single-member LLC "is not an exact science." *See Wallace*, 733 S.W.2d at 107. There are numerous acceptable methods of valuation. *Id.*

Husband reasserts on appeal that "[t]he correct way to value CLG . . . is to eliminate any goodwill and use the net asset value." He points to evidence that a majority of CLG clients came to the business through Husband's connections. In his view, because approximately 2.3% of Husband's clients came to him "out of the blue," "perhaps that 2.3% is akin to enterprise goodwill," but "[e]very other client is 100% attributable to Husband's personal goodwill."

4

Yet, the trial court did not base its decision to use the income approach on the way Husband obtained his clients. Instead, it considered the reports and testimony by Husband's and Wife's experts regarding whether Husband's trail income was salable. Wife's expert opined that the court should consider enterprise goodwill in the valuation because Husband could sell access to his client list and, therefore, the opportunity to manage those clients' assets, even if the clients would not be required to remain with the buyer. And Wife's expert explained how he calculated and took deductions from the valuation based on the risks that would be involved in a purchase of the single-member LLC and its lack of marketability. Though Husband's expert disagreed, the court found that Husband's trail income could be sold. And in the face of these conflicting opinions regarding CLG's value, the trial court was free to select a value within the range of the values presented by the competent evidence. *See Kinard*, 986 S.W.2d at 231; *Wallace*, 733 S.W.2d at 107.

Husband points to cases in which this Court has "been reluctant to allow enterprise goodwill to be divided as a marital asset upon divorce when the business involved is a sole proprietorship" as support for his argument that the trial court should have used the net asset value method. *See Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *6 (Tenn. Ct. App. June 29, 2015); *Hartline v. Hartline*, No. E2012-02593-COA-R3-CV, 2014 WL 103801, at *13 (Tenn. Ct. App. Jan. 13, 2014). But the choice of the proper valuation method depends on the unique facts of each case. *Wallace*, 733 S.W.2d at 107. We recognize that, "[w]hen the methodology or factual basis for an expert's opinion is patently flawed, the courts can and should discount the opinion." *Owens v. Owens*, 241 S.W.3d 478, 488 (Tenn. Ct. App. 2007). But the opinion of Wife's expert does not fall within that category. Her expert analyzed CLG's balance sheets and other financial documentation, interviewed Husband, cited legal and financial research, and explained each of the analytical steps in reaching his conclusion.

## III.

The evidence does not preponderate against the trial court's valuation of CLG Wealth Management, LLC. So we affirm.

_____s/ W. Neal McBrayer_____
W. NEAL MCBRAYER, JUDGE

5